UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TREMAYNE CHAPMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:19-cv-01897-JMS-DML |
| | ) |
| WEXFORD OF INDIANA, LLC, et al., | ) |
| | ) |
| Defendants. | ) |

**Order Denying Plaintiff's Motion for Summary Judgment and
Granting Defendants' Motion for Summary Judgment**

Plaintiff Tremayne Chapman, an inmate at Pendleton Correctional Facility ("Pendleton"), brings this lawsuit alleging that the defendants were deliberately indifferent to his serious medical needs after he injured his bicep and that their medical care violated his right to equal protection. Mr. Chapman seeks summary judgment on his Eighth Amendment claims, and the defendants seek summary judgment on all claims except Mr. Chapman's Eighth Amendment claims against Dr. Paul Talbot. These motions are now ripe for decision. For the following reasons, Mr. Chapman's motion for summary judgment, dkt. [38], is **denied**, and the defendants' cross-motion for summary judgment, dkt. [42], is **granted**.

**I. Summary Judgment Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of

1

a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941–42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion. *Grant v. Trustees of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the

existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

## II. Motion to Strike

In support of their motion for summary judgment, the defendants rely on the affidavit of administrative assistant Jessica Love, who helps with the scheduling of outside medical appointments at Pendleton. Dkt. 44-3. Mr. Chapman has moved to strike Ms. Love's affidavit because she was not previously disclosed as a witness. Dkt. 46.

Although he cites Fed. R. Civ. P. 12(f), Mr. Chapman's motion to strike is brought under Rule 37 of the Federal Rules of Civil Procedure, which states that if a party "fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). When deciding whether evidence should be excluded, the Court considers "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

The defendants argue Ms. Love's affidavit should not be stricken for several reasons. First, in their initial disclosures, defendants included a catch-all provision stating,

> There may be additional individuals who have discoverable information regarding the Plaintiff's allegations that the defendants may use to support their claims or defenses. It is expected that these individuals are listed in the Plaintiff's attached medical and grievance records obtained by IDOC. Please see these records for the identification of these additional individuals.

Dkt. 48 at ¶ 5. The defendants argue that Ms. Love's testimony was covered under this provision. Second, the defendants argue that, because Ms. Love's testimony is for the sole purpose of rebutting Mr. Chapman's argument that the defendants unnecessarily delayed in scheduling his off-site appointments, they did not need to include her in the witness list in discovery. The defendants also filed a supplement on April 17, 2020, one day after the dispositive motion deadline, adding Ms. Love to their witness list pursuant to Fed. R. Civ. P. 26(e). Finally, the defendants argue that the belated disclosure was not done in bad faith; counsel for the defendants was only made aware of Ms. Love's involvement with scheduling appointments when she was so advised by the defendants as she prepared the summary judgment motion.

Having reviewed the evidence, the Court **denies** Mr. Chapman's motion to strike, dkt. [46]. Mr. Chapman was not surprised by Ms. Love's involvement in scheduling his appointments, as he included emails between her and medical staff as exhibits to his motion for summary judgment. Dkts. 36-3 and 36-4. Ms. Love's testimony was non-expert rebuttal testimony and therefore did not have to be disclosed in the initial disclosures. Finally, there is no evidence that the defendants acted in bad faith.

### III. Statement of Facts

The following statement of facts has been evaluated pursuant to the standards set forth above. The facts are considered to be undisputed except to the extent that disputes are noted.

a. The Defendants

There are four defendants: Health Service Administrator ("HSA") Michelle LaFlower, Director of Nursing ("DON") Carrie Stephens, Dr. Paul Talbot, and Wexford of Indiana, LLC ("Wexford"). Wexford has provided healthcare for inmates at IDOC since 2018. Dr. Talbot was Mr. Chapman's treating doctor at all relevant times. Dkt. 44-4 at 92, 110.

HSA LaFlower is a licensed nurse. Dkt. 44-1 at ¶ 1. At all times relevant to Mr. Chapman's complaint, she was employed by Wexford as the HSA at Pendleton. *Id.* at ¶ 2. As the HSA, Ms. LaFlower did not see or treat Mr. Chapman for any of his medical needs, nor did she have authority to order specific treatment for Mr. Chapman. *Id.* at ¶¶ 4, 6. Ms. LaFlower did not schedule outside appointments for inmates at the prison. *Id.* at ¶ 8. She was responsible for managing PCF's overall health care delivery system and monitoring all health service contract activities. *Id.* at ¶¶ 4, 6. She consulted with the Regional Manager regarding routine administrative issues and discussed complex or unusual clinical issues involving patient management with clinical leadership. *Id.*

Carrie Stephens is a licensed nurse. Dkt. 44-2 at ¶ 1. At all times relevant to Mr. Chapman's complaint, she was employed by Wexford as the DON at Pendleton. *Id.* at ¶ 2. As the DON, she did not see or treat Mr. Chapman for his medical needs. *Id.* at ¶ 3. Rather, she was an administrator responsible for structuring and implementing the Nursing Services Program. *Id.* at ¶¶ 4, 7. Ms. Stephens participated in planning, priority setting, and developing policies and procedures for health care activities, coordinated and monitored orientation, in-service and continuing education,

received and reviewed daily outpatient and infirmary reports, and conducted regular meetings with nursing staff. *Id.* at ¶ 4. Ms. Stephens did not schedule outside medical appointments for inmates. *Id.* at ¶ 8.

    b.  Mr. Chapman's Injury and Treatment

On or about August 18, 2018, Mr. Chapman was playing basketball and suffered bicep tendon rupture in his left arm. Dkt. 44-4 at 27–28; dkt. 40 at ¶ 7. He received surgery eight months later and has experienced continuous pain both in the eight months leading up to the surgery and for about a year after the surgery. Dkt. 40 at ¶ 6. The following is a chronological summary of his treatment.

Mr. Chapman was seen by PCF medical providers the morning after his injury and was diagnosed with a left bicep rupture. *Id.* at ¶ 7. On August 20, 2018, Mr. Chapman saw Dr. Talbot for his injury. Dkt. 44-4 at 67. Dr. Talbot gave Mr. Chapman a sling, ordered him Tramadol and naproxen, and issued him a bottom bunk pass. *Id.* at 68–71.

On August 27, 2018, an on-site ultrasound was taken which revealed a tear in Mr. Chapman's bicep. Dkt. 44-3 at ¶ 6; dkt. 39-1. It was recommended that Mr. Chapman receive further imaging to reveal the extent of the injury. Dkt. 39-1. The Regional Medical Director approved the request for an outside evaluation and consultation with an orthopedic specialist on September 6, 2018. Dkt. 44-3 at ¶ 6.

Ms. LaFlower received a healthcare request form that Mr. Chapman submitted on September 5, 2018. *Id.* at ¶ 7. In it, Mr. Chapman complained about the pain medication he was prescribed and requested an MRI. *Id.* Ms. LaFlower responded on September 7, 2018, informing Mr. Chapman that the pain medication—Tramadol—was ordered only for a short duration, that he

had an order for another pain medication, Naproxen, and that an appointment with an orthopedic specialist had been approved and would be scheduled. *Id.*

Administrative assistant Jessica Love maintains a spreadsheet that tracks inmates' outside appointment dates and any reasons for rescheduling. Dkt. 44-3 at ¶ 5. Outside appointments for inmates are often rescheduled due to either a custody issue with transportation or the outside provider's need to reschedule. *Id.* at ¶ 4. An appointment with orthopedics was originally scheduled for October 5, 2018, but it had to be rescheduled because other offenders were already being transported to the hospital at that time. *Id.* at ¶ 6. Mr. Chapman's appointment was rescheduled to November 9, 2018. *Id.*

On November 9, 2018, Mr. Chapman had his consultation with an orthopedic surgeon who requested an MRI. *Id.* at ¶ 7. The request was submitted, and the Regional Medical Director approved it on November 19, 2018. *Id.*

Mr. Chapman received an MRI on November 26, 2018. *Id.* at ¶ 8. Based on the MRI results, on January 9, 2019, the provider requested that Mr. Chapman receive a follow up appointment with orthopedics.[1] *Id.* That request was approved by the Regional Medical Director on January 10, 2019. *Id.* Therefore, on January 18, 2019, an appointment was made for Mr. Chapman to follow up with orthopedics. *Id.* According to Ms. Love, the first available appointment was March 12, 2019. *Id.*

On February 26, 2019, Mr. Chapman submitted a request for interview asking about his

---

[1] Mr. Chapman includes as an exhibit an email from Ms. Love to Dr. Talbot dated November 20, 2018, in which she requests Dr. Talbot "put in an OPR for a Ortho F/u" for after the MRI, and notes that he had an appointment scheduled for December 14, 2018. Dkt. 39-3. Ms. Love does not explain why the December 14 follow-up appointment was rescheduled. However, the Court agrees with the defendants that nothing in this email indicated that Mr. Chapman was scheduled for surgery on December 14, 2018.

7

treatment plan since it had been two months since his MRI and six months since his injury. Dkt. 39-5 at 4. Ms. Stephens responded that he had an upcoming appointment with orthopedics. *Id.*

On March 6, 2019, Dr. Talbot emailed several individuals using the subject line: "CANNOT SEEM TO GET HIS NAME OR DOC." Dkt. 39-4 at 2. The email stated:

> This is man wth torn left biceps
> 1. Date of injury, @ 2 mo ago
> 2. MRI showing torn/ruptured biceps, @ 2 mo ago
> 3. OPR approved for Ortho, a little more than 1 mo ago
>
> Please help me with the name and DOC#. The question is where are we with his Ortho apt? Please advise.

*Id.* (errors in original). In a follow-up email on March 7, Dr. Talbot stated that Ms. Love had confirmed that the individual was Mr. Chapman, and she had provided Mr. Chapman's history and scheduling to Dr. Talbot. *Id.* at 1.

At Mr. Chapman's follow-up appointment on March 12, the orthopedic surgeon recommended surgery. Dkt. 44-3 at ¶ 9. The Regional Medical Director approved the request for surgery on Mach 18, 2019, and a pre-operative evaluation required by Eskenazi Hospital on March 28, 2019. *Id.* Mr. Chapman had his preoperative appointment on April 4, 2019, and his surgery on April 17, 2019. *Id.* Mr. Chapman stayed in the infirmary for a few days after his surgery and was provided pain medication by the nurse. Dkt. 44-4 at 81. After his surgery, Dr. Talbot prescribed Mr. Chapman Tramadol. *Id.* at 84; dkt. 39-2 at 1 (showing 9-day prescription for Tramadol).

Mr. Chapman was subsequently scheduled for, and received, two post-operative follow-up visits with orthopedics on May 30, 2019, and June 18, 2019. Dkt. 44-3 at ¶ 10. Orthopedics recommended a third follow-up visit, but Dr. Talbot and the Regional Medical Director agreed that onsite management of his treatment was appropriate. *Id.*, dkt. 39-7 at 1, 3.

When asked about how he has recovered from surgery, Mr. Chapman testified that he

received some pain medication for about a week, but he never received physical therapy or heard anything from Dr. Talbot after that. Dkt. 44-4 at 101. Dr. Talbot has not inquired to see "if the arm is even functioning." *Id.* He testified that he does not know if the orthopedic surgeon recommended that he have physical therapy, but a nurse showed him exercises to do at one of his follow-up visits. *Id.* at 102–03. Mr. Chapman has taken ibuprofen[2] to address his pain since surgery, but he has not submitted additional health care request forms because he thought seeking further help from Dr. Talbot would be futile. *Id.* at 109. Mr. Chapman is left-handed. Dkt. 44-4 at 89–90. Since surgery, he uses a sling when his arm is fatigued and has adapted to using his right hand for eating and using the washroom. *Id.* at 105. His chronic shoulder pain makes it difficult to write for long periods of time, so he had to give up his college courses and relies on help from inmates to write requests for health care. *Id.* at 90, 105.

Mr. Chapman alleges that Wexford was aware for eight months that he had suffered a serious injury and that, as a result of a "custom of bad practices," Wexford exacerbated his pain by "delaying treatment and denying proper pain medication." Dkt. 40 at ¶¶ 14–15. He alleges that Wexford's actions violated their contract with Indiana Department of Correction to provide healthcare to inmates. Dkt. 39 at 8, citing dkt. 39-8.

Similarly, Mr. Chapman alleges that Dr. Talbot is liable because he delayed treatment and denied Mr. Chapman adequate pain medication. *Id.* at ¶ 25. Dr. Talbot prescribed several pain medications from shortly after Mr. Chapman's injury until after his surgery, including Tramadol, Meloxicam, Tylenol, Tylenol with Codeine, and Naproxen. Dkt. 39-2. Mr. Chapman alleges that Dr. Talbot tried to cover up his inadequate medical care by falsifying Mr. Chapman's medical

---

[2] Besides ibuprofen, Mr. Chapman admits he has taken illicit drugs procured from other inmates to treat his pain. Dkt. 40 at ¶¶ 33–35.

9

records from a January 2019 encounter by writing that Mr. Chapman acknowledged he lifted weights and "denies pain."[3] *Id.* at ¶ 43.

Mr. Chapman alleges that HSA LaFlower and Ms. Stephens are liable for failing to ensure his outside appointments with the orthopedic specialist were timely made. *Id.* at ¶¶ 54, 56, 63, 65. He testifies that their actions were the result of Wexford's bad custom of delaying treatment. *Id.* at ¶ 58, 67. However, he admitted at his deposition that he did not know if HSA LaFlower or Ms. Stephens were responsible for scheduling appointments. Dkt. 44-4 at 39–40, 43–48. Mr. Chapman did not know who was responsible for scheduling his offsite appointments, but he believed that Dr. Talbot, HSA LaFlower, or Ms. Stephens should have. *Id.* at 48. Mr. Chapman never interacted with HSA LaFlower or Ms. Stephens in person. *Id.* at 45, 49.

When asked about his Fourteenth Amendment claim and what evidence he had that he was treated differently than others at Pendleton, Mr. Chapman testified that the evidence was the length of time it took to get his MRI. *Id.* at 58. When asked if he was aware of any other inmates receiving treatment more quickly than he did, he objected stating that the question was irrelevant. *Id.* at 59. When asked if he believed something should have been done immediately for him because he was aware of another offender receiving an MRI immediately, Mr. Chapman objected, but then testified, "No, once again, I'm not talking about someone else." *Id.* at 59–60.

## IV. Discussion

Mr. Chapman asserts Eighth Amendment medical care and Fourteenth Amendment equal protection claims against the defendants. Mr. Chapman moves for summary judgment on his

---

[3] Mr. Chapman alleges that Dr. Talbot changed the medical notes in the January encounter on February 27, 2019, after Mr. Chapman had filed a grievance against Dr. Talbot. However, the two pages of medical notes appear to be from two different appointments, the first from January 11, 2019, dkt. 39-9 at 1, and the second from February 27, 2019, *id.* at 2.

Eighth Amendment claims, and the defendants move for summary judgment on all Fourteenth Amendment claims and the Eighth Amendment claims against all defendants except Dr. Talbot.

### A. Eighth Amendment

At all times relevant to Mr. Chapman's claim, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014). Deliberate indifference in this context is "something akin to recklessness." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). "A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Id. at* 753.

For a medical practitioner, deliberate indifference can be shown by a "treatment decision that is 'so far afield of accepted professional standards' that a jury could find it was not the product of medical judgment." *Cesal v. Moats*, 851 F.3d 714, 724 (7th Cir. 2017) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)). The Seventh Circuit has explained that "[a] medical

11

professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

No defendant disputes for purposes of summary judgment that Mr. Chapman's experienced a serious medical need. Accordingly, the Court will consider only whether each defendant was deliberately indifferent to Mr. Chapman's medical care after he sustained his bicep injury.

### Dr. Talbot

Mr. Chapman seeks summary judgment against Dr. Talbot. Dr. Talbot has not moved for summary judgment on Mr. Chapman's claims but argues that there are material issues of fact that preclude summary judgment in Mr. Chapman's favor. The Court agrees.

Dr. Talbot was responsible for assessing Mr. Chapman's condition and determining the appropriate care for him. Dkt. 44-2 at ¶ 9. Dr. Talbot responded to Mr. Chapman's immediate needs by ordering an ultrasound and providing Mr. Chapman with a sling and Tramadol. Mr. Chapman received pain medication in the months between his injury through several weeks after his surgery, but there are periods where it seems Mr. Chapman received no prescription pain medication at all, *see* dkt. 39-2, and there is a question of fact as to whether the medication prescribed was sufficient to treat Mr. Chapman's pain. *See Machicote v. Roethlisberger*, 969 F.3d 822, 827 (7th Cir. 2020) ("Delaying necessary medication for hours of needless suffering can be sufficient for a jury to infer deliberate indifference."). On the other hand, Mr. Chapman presents no evidence that prescribing him Naproxen and Tylenol instead of a stronger pain medication like Tramadol was so outside the norms of accepted professional standards that a jury could conclude it was not based on Dr. Talbot's medical judgment. *Cesal*, 851 F.3d at 724.

There is also a question of fact as to whether Dr. Talbot was responsible in the delay for Mr. Chapman's treatment. Ms. Love asserts that Mr. Chapman had only one appointment rescheduled; his initial consultation with the orthopedic changed from October 5, 2018, to November 9, 2018. Dkt. 44-3 at ¶ 6. But an email from Ms. Love to Dr. Talbot indicates that a follow-up appointment had been made for December 14, 2018, dkt. 39-3, which seemingly did not occur. Further, there was a six-week delay between Mr. Chapman's MRI and when a request was made to the regional director to approve another consultation with orthopedics, which a jury could find unreasonable. The defendants attribute the subsequent two-month delay between the Regional Medical Director's approval of the post-MRI follow-up appointment and the date of the follow-up appointment to the orthopedic specialist's availability. *Id.* at ¶ 8. But the March 2019 email exchange between Dr. Talbot and administrators is probative evidence that Dr. Talbot was not ensuring the speedy treatment of his patient.

In short, there are material issues of fact with respect to the timing and adequacy of Dr. Talbot's medical care for Mr. Chapman, and Mr. Chapman's motion for summary judgment against Dr. Talbot must be **denied**.

**HSA LaFlower**

Based on the undisputed facts, HSA LaFlower was not deliberately indifferent to Mr. Chapman's serious medical needs. It is undisputed that the only time Mr. Chapman communicated directly with HSA LaFlower about his medical treatment was when he submitted a request for healthcare on September 5, 2018, asking about next treatment steps and complaining about the termination of his Tramadol prescription. Dkt. 39-6 at 1. She responded two days later, explaining why the Tramadol was discontinued and advising him that he had been approved to see

an orthopedic specialist. *Id.* This was a reasonable response and did not evince a reckless disregard for his needs.

Further, in her role, Ms. LaFlower did not treat inmates or schedule appointments. She had no authority to intervene in his treatment plan, and there is no evidence that she was aware of the eight-month delay between his injury and surgery. Accordingly, she was not deliberately indifferent to his medical needs. *Machicote*, 969 F.3d at 828 (holding health services manager was not liable where she had no knowledge of inmate's treatment, no authority to intervene, and no personal involvement beyond fielding a nurse's complaint about him).

Because no reasonable factfinder could find that HSA LaFlower acted with deliberate indifference, she is entitled to summary judgment.

**Ms. Stephens**

Like HSA LaFlower, it is undisputed that Ms. Stephens had no direct involvement in or responsibility for Mr. Chapman's care. The only evidence of any interaction between Mr. Chapman and Ms. Stephens was the February 26, 2019, request for interview in which Mr. Chapman inquired about his treatment plan. Dkt. 39-5 at 4. Ms. Stephens responded that he had an upcoming appointment with orthopedics. *Id.* She was not responsible for scheduling the appointment, nor did she treat Mr. Chapman at any point. Because she lacked authority to direct his care or order treatment, she is entitled to summary judgment. *See Machicote*, 969 F.3d at 828.

**Wexford**

Because Wexford acts under color of state law by contracting to perform a government function, *i.e.* providing medical care to correctional facilities, Wexford is treated as a government entity for purposes of Section 1983 claims. *See Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 fn.6 (7th Cir. 2002). As such, Wexford "cannot be held liable for damages under 42 U.S.C. §

14

1983 on a theory of *respondeat superior* for constitutional violations committed by their employees. They can, however, be held liable for unconstitutional … policies or customs." *Simpson v. Brown County*, 860 F.3d 1001, 1005–06 (7th Cir. 2017) (citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 690–91 (1978)).

Therefore, to prove a deliberate indifference claim against Wexford, Mr. Chapman must establish that he suffered a constitutional deprivation as the result of an express policy or custom of Wexford. Mr. Chapman must show that Wexford has: (1) an express policy that, when enforced, caused a constitutional deprivation; (2) a practice that is so wide-spread that, although not authorized by written or express policy, is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) an allegation that the constitutional injury was caused by a person with final policy making authority. *Estate of Moreland v. Dieter*, 395 F.3d 747, 758-759 (7th Cir. 2004); *see also Teesdale v. City of Chi.*, 690 F.3d 829, 833–34 (7th Cir. 2012) (noting policy or custom must be the "moving force" behind the deprivation of constitutional rights).

There is no evidence to support a conclusion that a Wexford policy caused the delay in his surgery. Mr. Chapman saw Dr. Talbot shortly after his injury and received an on-site ultrasound on August 27, 2018. The Regional Medical Director approved an outside evaluation with orthopedics on September 6, 2018. The initial appointment with orthopedics had to be rescheduled from October 5 to November 9, 2018, due to a transport issue, a common occurrence at Pendleton. Based on the specialist's recommendation, the Regional Medical Director approved a referral for an MRI on November 19, 2018, and Mr. Chapman received the MRI on November 26, 2018. The provider waited six weeks to request that Mr. Chapman receive a follow-up appointment with orthopedics. As mentioned above, a jury might conclude that such a delay was unreasonable. But that delay is attributable to an employee's actions rather than Wexford policy, and Wexford cannot

be held liable for that provider's actions in the absence of a policy or practice. *See Shields v. Ill. Dep't of Corr.,* 746 F.3d 782, 789 (7th Cir. 2014) (*Respondeat superior* is not a viable basis for a 42 U.S.C. § 1983 claim against a corporation.). Once the request was made, it was approved by the Regional Medical Director the next day. The Regional Medical Director also approved the requests for a pre-operative evaluation and surgery within a week of those requests. The only outside treatment that Wexford denied was a third post-operative follow-up visit with orthopedics after Dr. Talbot and the Regional Medical Director concluded that Mr. Chapman could be treated onsite. Mr. Chapman has not shown that Wexford had a policy of delaying outside appointments to avoid incurring the cost of outside treatment.

There is also no evidence that Wexford had a policy of denying pain medication to save money. Dr. Talbot decided which pain medications to prescribe and when, and Wexford is not liable absent evidence of a policy guiding his prescribing decisions.

Further, there is no evidence that other inmates experienced delay or improper pain management to support his policy claim. *Hildredth v. Butler*, 960 F.3d 420, 426–27 (7th Cir. 2020) (denying prisoner's *Monell* claim in part because he only introduced evidence about delays in his own healthcare and not that of other inmates).

Accordingly, Wexford is entitled to summary judgment on Mr. Chapman's policy and practice claim.

### B. Fourteenth Amendment

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting U.S. Const. amend. XIV, § 1). To succeed on his

equal protection claim, Mr. Chapman must allege that (1) he was a member of a protected class, (2) he was treated differently from a similarly situated member of an unprotected class, and (3) the defendants were motivated by a discriminatory purpose. *Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017).

Mr. Chapman does not allege he was in a protected class. However, the class of one equal-protection doctrine "recognizes that the Equal Protection Clause may give[ ] rise to a cause of action . . . where the plaintiff d[oes] not allege membership in a class or group *if* the plaintiff can show that []he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *D.B. ex rel. Kurtis V. v. Kopp*, 725 F.3d 681, 686–87 (7th Cir. 2013) (internal quotation marks and citations omitted.).

Mr. Chapman's equal protection claim fails, however, because he does not allege that he received worse or slower medical care than other inmates at Pendleton. When asked if he was aware of other inmates receiving superior care, he testified that other inmates' care was irrelevant to his claim. Accordingly, the defendants are entitled to summary judgment on Mr. Chapman's equal protection claim.

## V. Conclusion

For the foregoing reasons, Mr. Chapman's motion to strike Jessica Love's affidavit, dkt. [46], is **denied**. Mr. Chapman's motion for summary judgment against the defendants on his Eighth Amendment claims, dkt. [38], is **denied.** The defendants' cross motion for summary judgment, dkt. [42], is **granted**. Mr. Chapman's Fourteenth Amendment claims against all four defendants and Eighth Amendment claims against Michelle LaFlower, Carrie Stephens, and Wexford are dismissed with prejudice.

Because there are material issues of fact regarding Dr. Talbot's care of Mr. Chapman, the Eighth Amendment claims against him shall proceed to settlement or trial if one is necessary. No partial final judgment shall issue at this time.

The Court *sua sponte* reconsiders its denial of Mr. Chapman's motion for assistance with recruiting counsel. Dkt. 55. That motion, dkt. [54], is now **granted**. The Court will attempt to recruit counsel to represent Mr. Chapman for purposes of settlement and trial if one is necessary. Mr. Chapman will be notified once this step has been taken.

**IT IS SO ORDERED.**

Date: 1/21/2021

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

TREMAYNE CHAPMAN
157101
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Angela Marie Rinehart
KATZ KORIN CUNNINGHAM, P.C.
arinehart@kkclegal.com